IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:14-cr-230-AJT-4 |
| FARHIA HASSAN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant Farhia Hassan, a Dutch citizen currently residing in the Netherlands, has been indicted in this District for conspiring to provide material support to a foreign terrorist organization in violation of 18 U.S.C. § 2339B.  Hassan currently remains in the Netherlands while she contests her extradition to the United States.  Nevertheless, she has filed, through counsel, a motion to dismiss the indictment on the ground that her alleged actions lack a sufficient nexus to the United States, thereby violating the Fifth Amendment's Due Process Clause. [Doc. 343] ("Jurisdiction Motion").  Separately, Hassan moves to dismiss the indictment on the ground that the Government has violated her right to a speedy trial, as guaranteed by the Sixth Amendment [Doc. 344] ("Speedy Trial Motion"). The Government opposes both Motions. [Docs. 347, 348]. For the reasons discussed below, both Motions are **DENIED**.

**I.      BACKGROUND**

On June 26, 2014, a grand jury returned a twenty-one (21) count superseding indictment against Defendants Muna Osman Jama ("Jama"), Hinda Osman Dhirane ("Dhirane"), Farhia Hassan ("Hassan" or "Defendant"), Fardowsa Jama Mohamed ("Mohamed"), and Barira Hassan Abdhullahi ("Abdullahi") (collectively, the "Defendants"). In Count I of that superseding indictment, the Government charged each Defendant with conspiracy to provide material support

1

to a foreign terrorist organization, specifically, Harakat al-Shabaab al-Mujahideenal-Shabaab ("al-Shabaab"), in violation of 18 U.S.C. § 2339B.  In Counts II through XXI, the Defendants were individually charged with the substantive offense of providing material support to a foreign terrorist organization in violation of 18 U.S.C. §§ 2339B and 2.

Only Jama and Dhirane were found within the United States and the case proceeded against them without the other defendants, who remained abroad. On October 25, 2016, after conducting a three-day bench trial, the Court found Defendants Jama and Dhirane guilty of certain charges in the superseding indictment.  More specifically, the Court found Jama guilty on Counts I through XXI of the superseding indictment and found Dhirane guilty on Counts I and XVI through XXI of the superseding indictment and not guilty on Counts II through XV of the superseding indictment.  On November 4, 2016, the Court issued its Memorandum Opinion and Findings of Fact in Support of Verdict. [Doc. 232].  In that Memorandum Opinion, the Court memorialized its reasons for the verdict and simultaneously denied both Jama's and Dhirane's then-pending motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. *Id.*  On July 16, 2018, the United States Court of Appeals for the Fourth Circuit affirmed both verdicts. *United States v. Dhirane*, 896 F.3d 295 (4th Cir. 2018).

On February 28, 2019, a grand jury returned a one-count second superseding indictment against Hassan, Mohamed, and Abdullahi.  [Doc. 340] (the "Indictment").  In the Indictment, Hassan, Mohamed, and Abdhullahi are each charged with a single-count of Conspiracy to Provide Material Support to a Foreign Terrorist Organization in violation of 18 U.S.C. § 2339B. *Id.*  The Indictment alleges that from at least in or about February 2011 through July 2014 (the "relevant period"), Hassan conspired with Mohamed, Abdullahi, Jama, Dhirane, and another

individual, to knowingly provide material support and resources to al-Shabaab and in furtherance

of that conspiracy and to accomplish its unlawful goals engaged in the following overt acts:

1.      Hassan provided material financial support, in the form of regular monthly

payments, to al-Shabaab's operations in Somalia and elsewhere to directly support al-Shabaab's

efforts including, among other things, to help al-Shabaab obtain vehicles for use in its insurgency

in Somalia; and expressly for the purpose of aiding al-Shabaab in its retreat to the Golis

Mountains.[1] Indictment ¶¶ 1, 11, 15-16, 18.

2.      Hassan and her co-conspirators participated in and used the ISDAC (or

"Dacwatu al-Tawhid") on-line forum on PalTalk, a pro-al-Shabab "chat room," which was used

by al-Shabaab supporters to fundraise on behalf of that organization.  *Id.* ¶ 8.  The chatroom also

hosted live lectures by al-Shabaab leaders and clerics, including the one-time leader of al-

Shabaab forces in the Galgala region of the Golis Mountains in Somalia and another leader

(Sheikh Hassan Hussein) who had issued fatwahs that would have legitimized the killing of

members of nonviolent political opponents of  al-Shabaab. *Id*.

3.      Hassan participated in a chatroom as part of a group known as the "Group of

Fifteen," in which she, along with women located in the United States, United Kingdom,

Denmark, Sweden, Kenya and Somalia, communicated regularly about collecting monthly

payments in support of al-Shabaab as well as about current events concerning al-Shabaab's

activities in East Africa.  *Id*. ¶¶ 9-11.

4.      This "Group of Fifteen" met regularly and only those participants from the larger

ISDAC chatroom who had been or could potentially be persuaded to become committed

supporters of al-Shabaab were invited into the "Group of Fifteen," which was part and parcel of

---

[1] The Golis Mountains, also known as Qar Golis, are a mountain range located in western Somalia.

al-Shabaab's fundraising network and was integrated organizationally into al-Shabaab's structure as a foreign terrorist organization *Id*. ¶ 9.  Part of the mission of the Group of Fifteen was to recruit other women to provide funds to al-Shabaab and on occasion Hassan and other co-conspirators discussed how to deceive other women to pay money for al-Shabaab. *Id*. ¶¶ 12-13.

5.      The money collected by the "Group of Fifteen" went principally to two groups, the "Hargeisa side" and the "Nairobi side." *Id*. ¶ 11.  Mohammed was Jama's "Nairobi-side" conduit and lived in Kenya; Abdullahi and Hodan Ismail Hassan, a/k/a "Umu Mohamed," were Dhirane's "Hargeisa-side" conduits.  *Id*.  Dhirane's Hargeisa side provided funds to supply military equipment to al-Shabaab fighters in the Golis Mountain region. *Id*. Jama's Nairobi side funded two al-Shabaab safehouses in Kenya, one of which stored weapons and was a staging area for al-Shabaab attacks. *Id*.  In their respective roles as conduits, Mohammed, Abdullahi, and Uma Mohamed had access to leadership and coordinated their own activities in light of the specific needs of al-Shabaab, particularly as events unfolded as a result of al-Shabaab's military operations. *Id*.

6.      Hassan communicated with her co-conspirators for the purposes of funding al-Shabaab activities.  For example, on June 8, 2012, Jama contacted Hassan to tell her of al-Shabaab's need for trucks to retreat from Mogadishu and nearby Afgoye; in response, Hassan pledged to send $300 to help al-Shabaab obtain vehicles and coordinated with her co-conspirators in this regard.  *Id*. ¶ 15.  Also in June 2012, Hassan and Jama discussed a meeting of seven unidentified women in which each pledged between $300 and $1,000 for assisting al-Shabaab to retreat to the Golis Mountains; and in January 2013, Hassan contacted Jama and asked to whom Hassan should send a payment of $1,000, also in support of al-Shabaab. *Id*. ¶ 17.

7.      In the aggregate, the "Group of Fifteen," which again included Jama, Dhirane, and Hassan, among others, contributed thousands of dollars to al-Shabaab, both from their direct contributions and from those they solicited from other women around the globe. *Id.* ¶ 16.

## II.     LEGAL STANDARD

Federal Rule of Criminal Procedure 12(b) provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Within the scope of a Rule 12 motion is a challenge to the lawfulness of a prosecution on purely legal, as opposed to factual, grounds. *See United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012) ("[A] federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute."). "The sufficiency of an indictment and the interpretation of a federal statute are both matters of law" reviewable on a motion to dismiss an indictment. *Id.* at 76. However, "[u]nless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial[,] . . . the sufficiency of the evidence is *not* appropriately addressed on a pretrial motion to dismiss an indictment." *United States v. Alfonso*, 143 F.3d 772, 777-78 (2d Cir. 1998) (emphasis added).

## III.     ANALYSIS

At the outset, the Government argues that under the fugitive disentitlement doctrine the Court should hold both Motions in abeyance until Hassan physically arrives in the United States. [Doc. 348 at 2, n.2]. The fugitive disentitlement doctrine, which may be applied at the pretrial stage, is a discretionary doctrine that "limits access to courts in the United States by a fugitive who has fled a criminal conviction in a court in the United States." *In re Prevot*, 59 F.3d 556, 562 (6th Cir. 1995); *see also Jaffe v. Accredited Sur. & Cas. Co.*, 294 F.3d 584, 595 (4th Cir. 2002). The doctrine is grounded in the notion that a court should not rule on a motion if it

appears that the fugitive will only comply with a favorable ruling, *United States v. Oliveri*, 190 F. Supp. 2d 933, 936 (S.D. Tex. 2001), and that a court's consideration of a fugitive's pre-trial motion may encourage others to take flight from justice, while simultaneously contesting, when advantageous, their charges from abroad, *id.*  Here, there is little question that Hassan, in resisting her extradition to the United States to face trial, has "constructively fle[d]" the United States and in that sense is a "fugitive."  *United States v. Catino*, 735 F.2d 718, 722 (2d Cir. 1984); *see also United States v. Kashamu*, 15 F. Supp. 3d 854, 867 (N.D. Ill. 2014) (finding defendant is a fugitive given that, aware of the charges against him, defendant "[was] purposefully absenting himself from the United States to avoid arrest and arraignment on the charges").  Given the pending extradition proceedings against Hassan in the Netherlands and the possible assistance a ruling on the Motions may provide to the Dutch courts in connection with those on-going extradition proceedings, the Court will rule on the merits of the Motions.

### A.  The Jurisdiction Motion [Doc. 343]

In the Jurisdiction Motion, Hassan argues that there is an insufficient jurisdictional nexus between herself and the United States. [Doc. 343 at 2].  In particular, she characterizes the alleged object of the conspiracy as simply the transfer of funds between one foreign national located in one foreign country to other foreign nationals located in other foreign countries; and based on that characterization, contends that she is beyond the jurisdictional reach of United States' criminal laws and the Indictment must be dismissed against her. [Doc. 351 at 3-6].  The issue presented therefore centrally relates to the extraterritorial reach of U.S. criminal statutes generally and 18 U.S.C. § 2339B in particular, and whether Hassan's alleged conduct is beyond that extraterritorial reach.

The "presumption against extraterritoriality" is a canon of statutory construction that assumes that Congress intends its enactments, whether civil or criminal, to apply only domestically unless it clearly expresses a contrary intention. *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 255 (2010).  Because the presumption "is a method of interpreting a statute," it "is not a rule to be applied to the specific facts of each case;" rather "[a] statute either applies extraterritorially or it does not . . . ." *United States v. Vilar*, 729 F.3d 62, 74 (2d Cir. 2013).  To determine whether Congress intended a statute's extraterritorial application, courts first look to the text of the statute.  *See Roe v. Howard*, 917 F.3d 229, 240 (4th Cir. 2019) ("The first step of the [] framework asks whether the statute gives a clear, affirmative indication that it applies extraterritorially, and thereby rebuts the presumption against extraterritoriality. In making that determination, courts look to the text of the statute.") (internal quotation and citations omitted).

Here, § 2339B makes it a criminal offense to provide material support or resources to designated foreign terrorist organizations.  That statute explicitly applies extraterritorially to overseas conduct. 18 U.S.C. § 2339B(d)(2) ("There is extraterritorial Federal jurisdiction over an offense under this section."). In addition, the statute specifically confers jurisdiction over offenses if the underlying offense occurs in one of six specific ways, including the following: (1) if the offense occurs in whole or in part within the United States; (2) if the offense occurs in or affects interstate or foreign commerce; or (3) if an offender aids or abets any person over whom jurisdiction exists under this paragraph in committing an offense under [§ 2239B(a)] or conspires with any person over whom jurisdiction exists under this paragraph to commit an offense under [§ 2239B(a)].  18 U.S.C. § 2339B(d)(1)(D)-(F).

Hassan is not a resident or citizen of the United States nor is she alleged to have been physically present in the United States during her alleged conduct.  Nevertheless, Hassan is charged with participating in a conspiracy involving co-conspirators (Jama and Dhirane) who, during the relevant period, were United States citizens residing and physically located in the United States. *See United States v. Jama*, 217 F. Supp. 3d 882, 887 (E.D. Va. Nov. 4, 2016) ("Defendants [Jama and Dhirane] are both United States citizens and residents of the United States who were born in Somalia.").  Thus, this Court has *statutory* jurisdiction over Hassan's extraterritorial conduct under § 2339B(d)(1)(D), which covers "offense[s] occur[ing] in whole or in part in the United States," and under § 2339B(d)(1)(F), which covers "offender[s] [who] conspire[] with any person over whom jurisdiction exists."  *See United States v. Naseer*, 38 F. Supp. 3d 269, 272, n.3 (E.D.N.Y. 2014).

Having concluded that Hassan's alleged conduct is within the statutory scope of a federal statute that may be applied extraterritorially, the Court must next consider whether the statute's application comports with the Due Process Clause. *See United States v. Brehm*, 691 F.3d 547, 552 (4th Cir. 2012) (". . . enforcement in a particular instance must comport with due process"); *United States v. Hayes*, 99 F. Supp. 3d 409, 422 (S.D.N.Y. 2015) ("The statutory interpretation involved in determining if a statute is or is not extraterritorial reveals nothing (or, at best, very little) about whether a particular prosecution comports with the Fifth Amendment."). Whether the extraterritorial application of a statute violates due process depends on the presence of a "'sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair.'" *United States v. Al-Kassar*, 660 F.3d 108, 118 (2d Cir. 2011) (quoting *United States v. Yousef*, 327 F.3d 56, 111 (2d Cir. 2003)); *see also United States v. Davis*, 905 F.2d 245, 248-49 (9th Cir. 1990) ("In order to apply extraterritorially a federal

criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States so that such application would not be arbitrary or fundamentally unfair." (internal citation omitted)); *United States v. Mohammad-Omar*, 323 F. App'x 259, 261 (4th Cir. 2009) (same).  Where, as here, the charged conduct involves the conduct of a foreign citizen abroad, a jurisdictional nexus exists when the aim of that alleged activity is to cause harm inside the United States or to United States citizens or interests. *See United States v. Mostafa Kamel Mostafa*, 965 F. Supp. 2d 451, 458 (S.D.N.Y. 2013) (citing *Al-Kassar*, 660 F.3d at 118).  Therefore, the issue here reduces to whether Hassan's conduct sufficiently implicated harm to American citizens or interests.  As alleged, the Court concludes that it does.

Congress has legislated that the national interest is threatened by certain foreign terrorist organizations, *see generally* 18 U.S.C. §§ 2339A-B, and has delegated to the United States Secretary of State the responsibility to identify those foreign terrorist organizations for the purpose of subjecting them to sanctions, *see* 8 U.S.C. § 1189.  For this basic reason, courts have routinely found that § 2339B, no matter how applied, implicates the United States' interests. *See, e.g.*, *Naseer*, 38 F. Supp. 3d at 272-73 (citing *Al-Kassar*, 660 F.3d at 118); *Ahmed*, 2011 U.S. Dist. LEXIS 123182, at *6-8.

The material support statute requires that "the [defendant] have knowledge that the organization is a designated terrorist organization . . ., that the organization has engaged or engages in terrorist activity . . ., or that the organization has engaged or engages in terrorism . . . ." 18 U.S.C. § 2339B(a)(1); *see also Ahmed*, 2011 U.S. Dist. LEXIS 123182, at *6-7. Once combined with § 2339B's separate element that the United States find that designated terrorist organization has engaged in "terrorist activity or [that] terrorism of the organization threatens the

security of United States nationals or the national security of the United States," 8 U.S.C.

§ 1189(a)(1)(C), "there is a nexus to American interests so as to render the prosecution [under §

2339B] neither arbitrary nor fundamentally unfair." *Ahmed*, 2011 U.S. Dist. LEXIS 123182, at

\*7.

Contrary to Hassan's assertions otherwise, the facts alleged in the Indictment sufficiently

allege conduct that threatens the security of the United States or its citizens. In that regard, she

has been accused of directly conspiring with persons, at least two of whom were located within

the United States during the conspiracy, for the purpose of assisting the efforts of al-Shabaab, a

foreign terrorist organization ("FTO") designated as such by the United States Secretary of State,

*see* U.S. Dep't of State, Bureau of Counterterrorism, *Foreign Terrorist Organizations*, available

at https://www.state.gov/foreign-terrorist-organizations/ (accessed April 1, 2020).  That

designation was based on the threat posed by that organization to the security of the United

States and its citizens.  *See* 8 U.S.C. § 1189(a)(1)(C).  For these reasons, Hassan's conduct is

sufficiently connected to the United States' interests to ensure that her prosecution is neither

arbitrary nor unfair.[2]

---

[2] Hassan does not appear to contend that her prosecution is in violation of the Due Process Clause because she did not have "fair warning" that her conduct would expose her to prosecution in the United States; and any such contention would be without any merit. As other courts have held, the extraterritorial application of a statute like § 2339B provides fair notice and warning to overseas defendants, like Hassan, of the criminality of their conduct and the likelihood that they would be subject to prosecution somewhere, including in the United States.  *See, e.g.*, *Brehm*, 691 F.3d at 594  ("Fair warning does not require that the defendants understand that they could be subject to criminal prosecution in the United States so long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere.") (quoting *Al Kassar*, 604 F.3d at 119); *Mostafa*, 965 F.Supp.2d at 460 (same).  This is particularly the case where the conduct underlying the criminal charges relates to terrorism. *See Al-Kassar*, 660 F.3d at 119 (concluding that prosecution for material support to terrorism was not fundamentally unfair when foreign defendants supplied weapons to known terrorist organization overseas for use against U.S. citizens and property); *Ahmed*, 2011 U.S. Dist. LEXIS 123182, at \*7-8 (same).

The Court rejects Hassan's contention that because her transfer of money from the Netherlands to Somalia did not itself constitute a violation of United States law, she cannot be charged with a conspiracy whose object—providing material support to a foreign terrorist organization—did not involve any conduct on her part that is subject to prosecution in the United States. *First*, for reasons already stated, the substantive offense and object of the conspiracy here (providing material support to a designated FTO) is conduct over which this Court can exercise jurisdiction, even if that conduct occurred outside the United States. *Second*, Hassan incorrectly argues that the focus of the jurisdictional inquiry is strictly limited to consideration of her own conduct. *See* [Doc. 351 at 6 ("The underlying material support allegation is providing money from the Netherlands to Somalia . . . the government cannot simply tack on a conspiracy in an attempt to gain jurisdiction over an offense for which jurisdiction would otherwise lack.")]. While Hassan's prosecutable connection to the alleged conspiracy must be based on her own conduct sufficiently establishing her knowing participation in that conspiracy, once her status as a co-conspirator is established, jurisdiction over her as a co-conspirator arises out of not just her conduct but conduct attributable to conspiracy as a whole.

In *Ford v. United States*, 273 U.S. 593 (1927), multiple defendants were charged with conspiracy to violate federal law "by introducing into and transporting in the United States intoxicating liquor." *Id*. at 601. On appeal, the defendants argued that because "they were corporeally at all times during the alleged conspiracy out of the jurisdiction of the United States, [they] could commit no offense against it." *Id.* at 619-20. The Supreme Court, however, rejected this argument. Recognizing that "jurisdiction exists to try one who is a conspirator, whenever the conspiracy is in whole or in part carried on in the country whose laws are conspired against," *id* at 621-22, the Supreme Court held that, because the indictment charged acts within the

jurisdiction of the United States committed by certain conspirators, the United States had jurisdiction over those foreign conspirators who were not, at any time, within its territorial jurisdiction. *Id.* at 624; *see also Hayes*, 118 F. Supp. 3d. at 629 (applying *Ford* to reject defendant's argument that his connections to the United States must be assessed independently from his co-conspirator's, whose conduct maintained a sufficient nexus to the United States).

Under *Ford*, jurisdiction over Hassan is to be viewed within the context of the overall scheme to provide material support to al-Shabaab, part of which indisputably occurred in the United States. For instance, the Indictment alleges that co-conspirators Jama and Dhirane informed Hassan of al-Shabaab's need for money, *see* Indictment ¶ 15 ("On or about June 8, 2012, Jama contacted Hassan to tell her of al-Shabaab's need for trucks to retreat from Mogadishu and Afgoye."); and, at least one on occasion, delivered instructions to Hassan as to where she should send money, *see id.* ¶ 13 ("On or about September 24, 2013, Dhirane and Jama decided that they would tell Hassan to send her own money to the 'Nairobi side.'"). This conduct, based on the Indictment, was part of the overall conspiratorial scheme and provides a basis to assert jurisdiction over Hassan here.[3]

In summary, as in *Ford*, the acts of Hassan's alleged co-conspirators, *viz.* Jama and Dhirane, which occurred *within* the United States, allow the exercise of jurisdiction over Hassan with respect to the conspiracy in which she allegedly knowingly participated with them. And doing so does not violate the Fifth Amendment's Due Process Clause. Whether the allegations

---

[3] *See also United States v. Ali Hijazi,* 845 F.Supp.2d 874, 897-99 (C.D. Ill. 2010) ("The Court agrees with the Government. Hijazi's conduct should not be viewed in isolation, but instead in context of the overall scheme to defraud the U.S. Government, part of which indisputably occurred in the U.S."); *United States v. Manuel*, 371 F. Supp. 2d 404, 409 (S.D.N.Y. 2005) ("The Supreme Court has specifically upheld the exercise of jurisdiction over conspirators who have never entered the United States, where the conspiracy was 'directed to violation of the United States law within the United States.'") (quoting *Ford*, 273 U.S. at 620)).

as to Hassan can be proven beyond a reasonable doubt will be decided at the trial, but at this stage, the allegations must be taken as true and when taken as true, are clearly sufficiently to exercise jurisdiction over Hassan.[4]

For the above reasons, the Court denies Hassan's Jurisdiction Motion.[5]

### B. The Speedy Trial Motion [Doc. 344]

Hassan separately moves this Court to dismiss the Indictment on the ground that, for over five years, the United States has failed to diligently pursue her extradition and bring her to the United States for trial. This delay, she argues, constitutes a violation of her Sixth Amendment right to a speedy trial. [Doc. 344 at 5].

The Sixth Amendment guarantees that, "in all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial . . . ." U.S. CONST. amend. VI. On its face, the Speedy Trial Clause is expansive and if read literally, the clause would ostensibly prohibit the government to delay a criminal trial for any reason at all. The Supreme Court, however, has qualified the clause's broad sweep, recognizing that "any inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case." *Barker v. Wingo*, 407 U.S.

---

[4] Nor does the Court find persuasive Hassan's contention that 18 U.S.C. §§ 2339B(d)(1)(C), which authorizes jurisdiction once "an offender is brought into were found in the United States, even if the conduct required for the offense occurs outside the United States," essentially modifies and limits any jurisdiction authorized under (d)(1)(F). *See* [Doc. 351 at 7-9]. Those subsections state alternative grounds for the exercise of jurisdiction and are not cumulative requirements.

[5] For the reasons stated in connection with Hassan's Due Process claim, the Court also concludes that the extraterritorial application of § 2339B to the facts alleged here also comports with customary international law, *see Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch.) 64, 118, 2 L. Ed. 208 (1804) ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains"), and in particular, the protective principle of international law, which "permits a nation to assert subject matter criminal jurisdiction over a person whose conduct outside the nation's territory threatens the national interest." *United States v. Alomia-Riascos*, 825 F.2d 769, 771 (4th Cir. 1987) (citing the protective principle to conclude that the United States could exercise criminal subject matter jurisdiction over foreign nationals for possession of large quantities of narcotics on foreign vessels upon the high seas).

514, 522 (1972).  To that end, the Court has adopted a balancing test, identifying four factors to guide courts in determining whether, on balance, a defendant has been deprived of his or her constitutional right to a speedy trial. *See United States v. Eccleston*, 615 F. App'x 767, 775 (4th Cir. 2014) (unpublished). These factors are (1) the length of delay, (2) the reason for the delay, (3) the defendant's assertion of the right, and (4) prejudice to the defendant. *Barker*, 407 U.S. at 530.

The Supreme Court has also explained that any analysis under *Barker* does not begin until "there is some delay which is presumptively prejudicial."  *Doggett v. United States*, 505 U.S. 647, 651 (1992).  Here, the Government concedes that courts have found delays of greater than one year, as is the case here, to be "presumptively prejudicial" and sufficient to trigger a *Barker* inquiry.[6]  [Doc. 348 at 5].   Accordingly, the Court moves to a full analysis of the *Barker* factors.

### i.  Length of Delay

The constitutional right to a speedy trial attaches when a defendant is arrested or indicted, whichever comes first.  *See United States v. Marion*, 404 U.S. 307, 320 (1971).  Here, Hassan was first indicted on the charges relating to the conduct alleged in the current Indictment on July 23, 2014.  Her speedy trial right therefore attached nearly six years ago. *See United States v.*

---

[6] At the outset, the Government argues that Hassan has waived her Sixth Amendment speedy trial right because she is the "sole author of any delay." [Doc. 348 at 4].  While certain courts have recognized that a defendant may waive their right to a speedy trial based on their efforts to elude trial, *see, e.g.*, *In re Kashamu*, 769 F.3d 490, 494 (7th Cir. 2014); *United States v. Manning*, 56 F.3d 1188, 1195 (9th Cir. 1994), these cases have typically done so only after analyzing the *Barker* factors.  Moreover, a defendant's failure to assert the right to a speedy trial, and even the explicit waiver of that right, is not entirely dispositive of a speedy trial claim. *See Barker*, 407 U.S. at 528-30.  As such, the Court declines to find, for purposes of the Speedy Trial Motion, that Defendant has waived her right to a speedy trial. *See also Doggett*, 505 U.S. at 651-52 ("Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay…").

*Black*, 918 F.3d 243, 259 (2d Cir. 2019) (noting, over dissent's objection, that the calculation for length of delay under *Barker* begins, and does not ignore, the first time defendant stands accused for the same underlying conduct); *United States v. Thomas*, 55 F.3d 144, 149 (4th Cir. 1995) (citing *Doggett*, 505 U.S. at 650). Thus, the length of the delay favors Hassan.

ii. <u>Reason for Delay</u>

The second factor is the most crucial factor in this case. On the one hand, Hassan argues that the delay in extraditing her to the United States, and the corresponding delay to trial, lies with the Government. In particular, she points to the Government's delays in providing the information requested by the Dutch authorities and the Government's request for a stay in the matter as it sought to obtain information relevant to Hassan's extradition pursuant to a U.S.-Dutch MLAT. [Doc. 344 at 5-6]. On the other hand, the Government argues that, as a general matter, any delays associated with the extradition process cannot be attributed to it for the purposes of weighing this factor. [Doc. 348 at 8-10]. In that regard, the Government contends that the delays in Hassan's extradition are principally the result of her extensive efforts to contest its related MLAT request, which sought evidence the Government needed to produce to the Dutch court for purposes of her extradition. *Id*.

In deciding in favor of whom (or against whom) this factor should be weighed, the Court has considered the following timeline of events, which Hassan does not dispute:

- On September 11, 2014, the United States submitted to the Netherlands a formal request for the extradition of Hassan.

- On September 15, 2014, the United States asked that the Dutch Public Prosecutor schedule the extradition hearing as soon as possible. On the same day, the U.S. Department of State submitted to the Netherlands a diplomatic note requesting the extradition of Farhia Hassan and presented it and the extradition papers to the Dutch Ministry of Justice and Security.

- On September 22, 2014, the United States was informed by Dutch authorities that the Dutch court had approved the transfer of the seized and intercepted materials in connection with its June 26, 2014, MLAT request, but that defense had appealed to the Supreme Court. Because the decision to transfer was not final, Dutch law did not allow the transfer of any of the disputed materials until there was a final judgment.

- On September 22, 2014, the United States was informed by Dutch authorities that a hearing date had not been set regarding the MLAT request and that it would not occur for several months. The Dutch authorities reported that the next hearing was on November 7, 2014, but that the hearing was only to schedule a series of additional hearings.

- On January 16, 2015, Dutch authorities informed U.S. authorities that the defendant had asked the Dutch prosecutor for additional information from the United States. The U.S. authorities provided a partial response to the questions the same day. The U.S. authorities provided a full response on January 20, 2015.

- On January 23, 2015, Dutch authorities informed U.S. authorities that the Dutch court had adjourned the case and would schedule another hearing because the court believed that additional information was necessary. The court wanted to know more about the defendant's role with transactions to al-Shabaab. In its ruling, the Dutch court said,

   > The request in regards to the taped conversations is denied. Also, the court is of the opinion that the evidence submitted is not sufficient and more evidence needs to be submitted by the United States authorities in regards to the question; which of the mentioned transactions in the indictment involved the accused, and what her role was in those transactions. The public prosecutor is asked to request this additional information from the United Stated authorities.

- On February 9, 2015, U.S. authorities asked for clarification of the court's ruling, noting that it appeared that the court was asking for the same information the United States had already provided, which explained that Hassan did not have any direct involvement with any of the substantive payments of the then-existing indictment. U.S. authorities explained again that Hassan had been charged for aiding and abetting and being a coconspirator.

- On May 28, 2015, U.S. and Dutch authorities met and discussed, among other matters, the progress of the Hassan proceedings in the Netherlands. At that time, the Dutch court proceedings regarding extradition were scheduled to take place well before the hearings on the U.S. MLAT request.

- *On June 5, 2015, because the U.S. authorities believed that the evidence requested in the MLAT would be necessary to satisfy the Dutch court's request for addition evidence to support extradition, the U.S. authorities requested that the extradition proceedings be continued until a decision on the MLAT request.* This was motivated by the fact that the

Dutch courts had expressed concern about the relatively small amounts that Hassan had been allegedly involved in sending to al-Shabaab, and the United States needed hawala[7] and other financial records from the Netherlands to satisfy the court. But until the proceedings on the MLAT request were resolved, the United States could not obtain this evidence.

- On June 9, 2015, the Dutch authorities reported that the extradition hearings would be postponed until a decision on the MLAT request.

- On January 26, 2016, the Dutch authorities reported that the court had granted permission to transfer the seized evidence to U.S. authorities.

- However, on March 3, 2016, the Dutch authorities reported that the court decision allowing the transfer of the seized items to the U.S. authorities had been suspended, because lawyers for Hassan (for the second time) filed an appeal on February 16, 2016. As a result, the evidence could not be released pending a decision by the Dutch Supreme Court. The date of the hearing on the appeal was not yet known at that time.

- On April 20, 2017, Dutch authorities reported that the Dutch Supreme Court had rejected the Hassan's appeal and had allowed the release of the evidence to the United States, but that a written decision had not yet been entered.

- On May 1, 2017, U.S. authorities contacted the Dutch authorities to ask when the evidence would be provided. On May 4, 2017, the Dutch authorities responded that the evidence was still with the Dutch Public Prosecutor.

- On July 31, 2017, the United States received a partial response to its MLAT request to the Netherlands. However, among other shortcomings, the response did not include critical bank records or records from hawalas or other money transmittal businesses that would have shown the defendant's financial transactions.

- On August 15, 2017, U.S. authorities requested that the Dutch authorities re-initiate the extradition proceedings and respond fully to the MLAT request. As of that date, the United States still had not received a full response to its MLAT request.

- On September 23, 2017, U.S. authorities asked the Dutch authorities whether a hearing date had been set for the extradition proceedings.

- On November 13, 2017, Dutch authorities reported that no hearing date had been set for the extradition proceedings. The U.S. authorities responded by asking that a hearing date

---

[7] Hawala is a system of transferring money in the Islamic world. *See United States v. Banki*, 685 F.3d 99, 103 (2d Cir. 2011) ("The transfers were effectuated through an informal system called a 'hawala.' The hawala system is widely used in Middle Eastern and South Asian countries, and is primarily used to make international funds transfers.").

be set as soon as possible. On November 20, 2017, the United States provided the Dutch
authorities with a detailed and lengthy elucidation of the evidence against Hassan.

- On June 1, 2018, after multiple efforts to track down the requested financial information,
  U.S. authorities again asked the Dutch authorities about the status of the MLAT request.

- On June 15, 2018, Dutch authorities informed U.S. authorities that they had confirmed
  with the Dutch police that no information on financial transactions by the defendant was
  available given the passage of time. *The MLAT request was then closed.*

- On February 19, 2019, a grand jury in this District returned a second superseding
  indictment charging Hassan with conspiracy to provide material support to a designated
  foreign terrorist organization, in violation of 18 U.S.C. § 2339B. The indictment added
  several paragraphs specifically detailing the role of the defendant in the conspiracy, the
  absence of which had been of concern to the Dutch courts with respect to Hassan's
  extradition.

- On March 14 and 20, 2019, U.S. authorities again asked the Dutch authorities about the
  status of the extradition proceedings and requested that a hearing be scheduled as soon as
  possible.

- On April 18, 2019, U.S. authorities again asked the Dutch authorities about the status of
  the extradition proceedings. The Dutch authorities responded that a hearing on the
  extradition request had been scheduled for July 11, 2019; however that later changed due
  to a court conflict.

- On July 30, 2019, the Dutch authorities reported that a hearing date had been set for
  December 12, 2019.

- On December 17, 2019, the Dutch authorities reported that an interpreter had failed to
  appear for the December 12, 2019, hearing and that a new date had been set for January
  9, 2020.

- *After the January 9, 2020 hearing, on January 23, 2020, the Dutch court in Rotterdam
  found in favor of extradition.* According to the Dutch authorities, the defendant has a
  right to appeal the decision, which would further delay extradition.

*See* [Doc. 348-1 (emphasis added)].

Based on this history, Hassan contends that the Government failed to sufficiently pursue
extradition, especially during the MLAT proceedings. Doc. 352 at 2-4] ( "there was no reason
the government could not have pursued Ms. Hassan's extradition contemporaneously [with the
MLAT proceedings]). But that argument is belied by the record. As Hassan herself admits, the

Government had no control over the Dutch proceedings, *see* [Doc. 352 at 7], and the Government was required to obtain further information from Hassan pursuant to a U.S.-Netherlands MLAT treaty in response to the Dutch courts' requests for additional information. That need necessarily limited the Government's ability to advance the extradition process, which was further delayed while Hassan pursued all avenues of appeal in an attempt to avoid providing the requested evidence, including two trips by Hassan to the Dutch Supreme Court.

Overall, while there were periods when the Government arguably could have acted with additional dispatch, Hassan chose to resist at nearly every turn the Government's efforts to extradite her to the United States to face trial here, instead of facilitating a speedy trial by foregoing the extradition process. Almost all of the delay resulting from the extradition process, therefore, must be counted against Defendant in assessing the reasons for the long delay that has occurred in this case. As a result, the Court finds that overall the Government can be considered directly responsible for only a small portion, if any, of the delay in the current, ongoing extradition proceedings.

### iii.   Defendant's Assertion of Her Speedy Trial Right

The Supreme Court has rejected a "rule that a defendant who fails to demand a speedy trial forever waives his right." *Barker*, 407 U.S. at 528.  Instead, "the primary burden [is] on the courts and the prosecutors to assure that cases are brought to trial." *Id*. at 529. Nevertheless, "a defendant has some responsibility to assert a speedy trial claim," *id*., since "[t]he Speedy Trial Clause primarily protects those who assert their rights, not those who acquiesce in the delay— perhaps hoping the government will change its mind or lose critical evidence," *United States v. Aguirre*, 994 F.2d 1454, 1457 (9th Cir.), *cert. denied*, 510 U.S. 1029 (1993). *See also United*

*States v. Schreiber*, 535 F. Supp. 1359, 1363 (S.D.N.Y. 1982) ("The speedy trial requirements should not operate to reward a recalcitrant and reluctant defendant.").

Although the Court concludes that the Defendant has not waived her right to a speedy trial, she, nevertheless, did not formally assert her right to a speedy trial in the United States until she filed her Speedy Trial Motion, over five years after the initial indictment was returned and nearly one year after the operative second superseding indictment was returned.  Furthermore, Hassan has made no effort to expedite her extradition to the United States, whether by waiving extradition, producing the requested documents, withdrawing her contest to the MLAT request, or appearing in United States for trial; and the notion that Hassan valued any right to a speedy trial conflicts sharply with her efforts to contest her extradition in the Netherlands and delay any trial as long as possible.  *See United States v. Mitchell*, 957 F.2d 465, 469 (7th Cir. 1992) (where overseas defendant made no attempt to demand a trial, waive extradition, or otherwise seek to return to the United States to stand trial, and first asserted his right to speedy trial in a pretrial motion, this factor is weighed against defendant).[8]  Given the length of time before Hassan asserted her speedy trial right and her efforts to resist extradition in the interim, the Court weighs this factor against her.

---

[8] *See also Kashamu*, 15 F. Supp. 3d at 863-64 ("At the latest, Kashamu became aware of this indictment on December 18, 1998, when he was arrested in England on the outstanding warrant. Notwithstanding that knowledge, Kashamu waited more than fifteen years to file the instant motion raising his right to a speedy trial. Kashamu's previous motion seeking dismissal of this indictment filed in 2009, notably, did not contain an assertion of his speedy trial right. This is not to say, however, that a speedy trial objection ten years after he knew of the indictment would have been considered timely. Rather, it further demonstrates the degree to which his current objection is untimely. Indeed, Kashamu's fifteen year delay in asserting this right weighs against him.") (citing *Doggett*, 505 U.S. at 653).

iv.   Prejudice to Defendant Caused by Any Delay

The Court also finds that Hassan has demonstrated little, if any, prejudice as a consequence of the delay and any such prejudice would be attributable to her own decisions persistently to avoid extradition. *See United States v. Reumayr*, 530 F. Supp. 2d 1200, 1208 (D.N.M. 2007) ("Defendant has clearly suffered prejudice from the long delay that has occurred in this case, as he has been incarcerated, either here or in Canada, for the entire period of that delay . . . [However] [s]ince most of the delay is attributable to Defendant . . . the prejudice he has suffered cannot be weighed against the Government."). As such, this factor does not favor Hassan.

v.   Balance of the Factors

Based on a balancing of the above factors, the Court finds that the Government has not violated Hassan's constitutional right to a speedy trial. Under the facts presented, Hassan has spent over five years actively attempting to avoid any trial in the United States and only recently has she asserted her right a speedy trial while having pursued, and continuing to pursue, all available means to avoid her extradition. From these facts, the Court finds that the delay in trying Hassan, as well as any prejudice suffered as a result, is, on balance, more attributable to Hassan than the Government. Therefore, dismissal of this case on Sixth Amendment speedy trial grounds is unwarranted, and Hassan's Speedy Trial Motion is denied.

## IV.   CONCLUSION

For the reasons stated above, it is hereby

ORDERED that Defendant Farhia Hassan's Motion to Dismiss the Indictment for Lack of Jurisdiction [Doc. 343] be, and the same hereby is, **DENIED**; and it is further

ORDERED that Defendant Farhia Hassan's Motion to Dismiss the Indictment for Speedy

Trial Violation [Doc. 344] be, and the same hereby is, **DENIED.**

The Clerk is directed to forward copies of this Order to all counsel of record.

Anthony J. Trenga
United States District Judge

Alexandria, Virginia
April 2, 2020