IN THE UNITED STATES DISTRICT COURT FOR

THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 1:14-cr-230 (AJT) |
| ) | |
| FARHIA HASSAN, ) | |
| ) | |
| Defendant. ) | |

**UNITED STATES'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGEMENT OF ACQUITTAL AND TO DISMISS FOR LACK OF JURISDICTION**

The United States, through its undersigned attorneys, respectfully asks the Court to deny the defendant's motion for a post-trial judgment of acquittal and to dismiss the indictment for lack of jurisdiction. The defendant's motion seeks to revisit issues upon which the Court has ruled repeatedly over the course of pre-trial litigation and trial. The facts and the law have not changed. The defendant's motion must be denied.

I.   THE GOVERNMENT'S EVIDENCE WAS SUFFICIENT FOR CONVICTION

The evidence against the defendant was overwhelming. As the defendant agrees in her motion, the guilty verdict of a jury must be sustained if "viewing the evidence in the light most favorable to the government, any rational trier of facts could have found the defendant guilty beyond a reasonable doubt." *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982). The government is allowed "the benefit of all reasonable inferences from the facts proven to those sought to be established." *Id*. The Court "must assume that the jury resolved all contradictions in favor of the government." *United States v. Romer*, 148 F.3d 359, 364 (4th Cir. 1998). Here, the defendant was charged with a single count of conspiracy to provide material

support to al-Shabaab, a designated foreign terrorist organization, in violation of 18 U.S.C. 2339B. The defendant makes a number of arguments attacking the sufficiency of the government's evidence. But each of those arguments misstates the evidence as presented at trial, or otherwise mischaracterizes the inferences that should have been drawn from that evidence. The government's trial evidence was more than sufficient to find the defendant's knowing and voluntary participation in the charged conspiracy.

    A.   *The defendant participated in a conspiracy rather than acting independently.*

    The defendant first argues that the government's evidence was insufficient to establish the defendant's participation in a conspiracy. While conceding that she sent money to al-Shabaab, her motion argues that she did so as an independent actor who was simply "answer[ing] the call of a solicitor," rather than as part of a common plan, joint action, or partnership. Not so. The government's evidence of a conspiracy was overwhelming. As a preliminary matter, Amina Esse—whose testimony must be accepted with all credibility determinations made in her favor for purposes of a Rule 29 motion, *Romer*, 148 F.3d at 1021—directly and explicitly testified that she entered into an agreement to send money to al-Shabaab along with the defendant, Muna Osman Jama, Hinda Osman Dhirane, and the other members of the Group of Fifteen. Esse's testimony laid out a nearly textbook conspiracy: the Group of Fifteen had regular, scheduled meetings in a private online chatroom. During those meetings, they would discuss making monthly payments to al-Shabaab, via Fardowsa Jama Mohamed in Kenya (to fund safehouses in Nairobi), and Dhirane's contacts in Hargeisa, as well as occasional one-time payments for larger unexpected al-Shabaab expenses. Jama tracked the group members' payments and pressured them if they didn't pay on time. The meetings were carefully organized and scheduled. The

payments were carefully organized and scheduled.  Members were vetted and their bona fides carefully assessed.  Operational security was paramount.  Of course the defendant took "independent action," in the sense that each member of the conspiracy took independent actions to execute their individual part of the larger scheme.  A financing conspiracy can only be successful if each member does independently send the money they pledge.  But each of those actions, each of those payments, was still made within the scope of the larger agreement.

All of Esse's testimony, furthermore, was corroborated by the other evidence in the case: the hawala transactions that Esse made, the ledgers kept by Jama in her notebooks, and, of course, the words spoken by the defendant and the rest of the Group of Fifteen in the transcripts of their chats and phone calls, thoroughly establishing the purpose of, and understanding among, the group.

Furthermore, even were the defendant correct in her characterization of the evidence— *i.e.*, that the defendant merely "answered the call" of Jama's solicitation to send money to al-Shabaab—that agreement between Hassan and Jama on its own would be sufficient to establish the charged conspiracy.  Answering a solicitation to send money to a terrorist organization, at the direction of the solicitor and to a recipient identified by the solicitor, is, itself, a criminal conspiracy: an agreement to commit a crime.  Offer and acceptance is the essence of an agreement, and therefore the essence of a conspiracy.  *See, e.g.*, *United States v. Ulbricht,* 31 F. Supp. 3d 540, 556-58 (S.D.N.Y. 2014) (discussing the application of contract principles of offer and acceptance to a solicitation to participate in a criminal conspiracy).  Though there was substantial additional evidence of the larger conspiracy and the defendant's place in it, even the evidence as the defendant characterizes it would be sufficient for a finding of guilt.

    B. *The defendant knew she was sending money to al-Shabaab, a foreign terrorist organization.*

The defendant next argues that the evidence was insufficient to show her knowledge either that a) she knew she was sending money to al-Shabaab, or b) that al-Shabaab was a designated terrorist organization or engaged in terrorist activity or terrorism, as defined by the statute.

First, the government adduced substantial evidence from which a reasonable juror could conclude that the defendant knew that her payments were going to al-Shabaab. Knowledge is, of course, an element generally proven by inference, as it is impossible to know the inner workings of a defendant's mind. Here, Amina Esse's testimony described the defendant as a well-connected member of the Group of Fifteen, who was already established in the chatroom by the time Esse joined in early 2012: specifically, Esse testified that Ummu Ibrahiim (the moniker by which she knew the defendant) "welcomed" her into the group. Esse testified that she saw the defendant in the pro-al-Shabaab ISDAC chatroom almost every day, where al-Shabaab activity was constantly being discussed. To whatever extent Esse was misled about the purpose of the group, it was over a short period of time; she testified that Jama revealed the full extent of the conspiracy to her after about three months. The defendant, in contrast, was a member of the group before Esse even joined, and remained a member of the group for over a year after Esse left. Esse testified that while some women, including she herself, were briefly initially misled about the recipients of the money, that "eventually they would tell [the women] the real story, and they would be happy with that." The notion that the defendant, uniquely among all the other members of the Group of Fifteen, was kept in the dark about the purposes of the conspiracy for *over two years* defies credulity, especially given her active and reliable participation.

4

Furthermore, the defendant specifically identified Jama as a member of al-Shabaab in GEX 123, where the defendant says to Jama, "they said to slaughter anyone who supports al Shabaab, so […] be careful that you don't get slaughtered."  The context of this had already been established by GEX 68, where the defendant is a participant in a chatroom conversation where another member of the group writes that "She even pledged allegiance to the Emir / Umu Luqmann, you know / Abu Zubeyr."  Umu Luqmann is Jama's PalTalk moniker; Abu Zubeyr is the kunya of Ahmed Abdi Godane, the leader of al-Shabaab at the time.  Matthew Bryden testified to the significance of pledging allegiance to the Emir of al-Shabaab, explaining that it effectively made one a member of the terrorist organization: a reasonable juror could certainly conclude from this context that the defendant considered Jama to be an active member of the group—and, from that, that she understood the fundraising to be for al-Shabaab.  Again, for purposes of a Rule 29 motion, all these inferences must be drawn in the light most favorable to the government.  When taken in that light, the evidence of the defendant's knowledge is overwhelming.

Further evidence of the defendant's knowledge included the phone conversation in GEX 82 in which she and Jama discuss the money the Group of Fifteen is raising to purchase "camels" for the "family."  With the context provided by Mr. Bryden, there can be no doubt whatsoever about what Jama is describing to the defendant when she says, "of course the areas in Mogadishu that they were located had to be vacated; they moved out from those areas and Afgoye."  To Jama and the defendant, both of whom closely followed Somali news and current events, the "they" being referred to is unmistakable: this conversation took place in June 2012 when AMISOM troops were forcing al-Shabaab out of Mogadishu and Afgoye.  In response to Jama's

5

request for "nine with large wings" to purchase "transportation for the family," the defendant responded, "Sister, write down that I pledge three zeros." And indeed, Jama did write that down, in the notebook that later became GEX 3C-2.

All of this evidence also illustrates the defendant's knowledge that al-Shabaab engaged in terrorist activity or terrorism, as defined by statute. Based on the evidence presented at trial, the jury could reasonably infer that the defendant's frequent presence in the ISDAC chatroom alone would be enough to show her knowledge of the group's terrorist activity. Testimony from the government's expert witness, Matthew Bryden, made clear both that al-Shabaab's activities were unique even amidst the ongoing violence in Somalia—they were the only group that engaged in activity that directly and deliberately targeted civilians, and the only group to use suicide bombings and complex attacks on civilian targets—and that those specific activities were routinely and explicitly discussed in the ISDAC chatroom. Esse testified about the calls to action that she frequently heard in the ISDAC chatroom: "that people should be killed . . . the unbelievers, Christians and the Jews." According to Esse, the listeners in ISDAC were instructed that "if you have a gun, use it, use a car to overrun them . . . use a bottle to throw at them . . . any way you can participate in the jihad, even pour gas on them and light them on fire." These calls to action were specifically for "jihad" in the Western world—listeners were instructed that if they could not participate in their home countries, they should "come to Somalia and join [al-Shabaab] there." This was not a situation where someone like the defendant could reasonably be confused about warring militant groups in Somalia: these were explicit calls for terrorist attacks on civilians in the West.

Of course, because there is no specific record of which of these many lectures and chats

6

the defendant participated in (though, again, Esse testified that she saw the defendant in the ISDAC chatroom almost every day), the government adduced additional specific evidence showing her knowledge that al-Shabaab engaged in terrorist activity and terrorism. Those exhibits included GEX 123—a discussion between Jama and the defendant regarding al-Shabaab's assassination of Abdulkadir Nur Farah, a noncombatant cleric shot in the back while he was praying—and the group phone call that extends over GEX 159-163, where the defendant listens (and briefly speaks in response) to Ayan Jama Warsame's lengthy lecture extolling the virtues of al-Shabaab's suicide bombers—a lecture which *specifically* addressed the ongoing rift within al-Shabaab about the political consequences of conducting suicide attacks against civilian targets, and which specifically advocated for the side of the rift that was *in favor* of those attacks. And while the defendant only speaks briefly on the call, there is nothing in the record to suggest that she did not listen to the entire thing; certainly a reasonable jury could have concluded so.

Finally, the defendant's participation in and understanding of the group's operational security is further evidence of her consciousness of guilt. As Matthew Bryden testified, remittances are ubiquitous in Somali culture, a central pillar of the entire Somali economy. There is nothing shameful, unusual, or secretive about sending them, nor anything shameful, unusual, or secretive about receiving them. Yet evidence showed that the defendant, at various points in the course of the conspiracy, sent money under the name "Hayat Abdi," rather than her own name. GEX 170 features a lengthy conversation where the defendant talks about misleading other women into donating money to fake charities. In GEX 82, the defendant leans into the code language and veiled speech, and pledges "three zeros" instead of saying three hundred dollars. The evidence showed ample intent on the defendant's part to deceive others as

7

to her true purpose—further proof that she understood the illegality of financing al-Shabaab.

### C. *There is no First Amendment right to enter into criminal conspiracies.*

Next, the defendant argues that her conviction for a terrorist financing conspiracy violates the First Amendment. She cites no caselaw to establish this unusual contention, because no such caselaw exists.[1] It is well established that conspiring to commit a crime is criminal conduct, not speech. *United States v. Hassan*, 742 F.3d 104, 127 (4th Cir. 2014) ("[f]orming an agreement to engage in criminal activities—in contrast with simply talking about religious or political beliefs—is not protected speech.") (citing *United States v. Amawi*, 695 F.3d 457, 482 (6th Cir. 2012)). There exists no First Amendment protection for entering a criminal conspiracy: though it is a crime "characteristically committed through speech"—along with incitement, threats, solicitation, and other such speech offenses—there is no First Amendment bar to prosecuting conspiracy. *United States v. Rahman*, 189 F.3d 88, 117 (2nd Cir. 1999). Though the government adduced substantial evidence that the defendant did in fact make actual contributions, not just verbal pledges, in the multiple chats and phone calls where various members of the conspiracy note that Ummu Ibrahiim's contributions were "*received*," the crime was complete at the time of the pledges, when the agreement to send money was made, and such a conviction in no way violates the defendant's First Amendment rights.

---

[1] The cases cited by the defendant in her motion, purportedly in support of this claim, address the issue of whether mere *membership* in a terrorist organization is protected by the First Amendment. Nothing in the *Holder v. Humanitarian Law Project* case, or its various progeny cited in her motion, contemplates treating the act of pledging or donating money to a terrorist group as protected speech.

8

## II. THE COURT HAS JURISDICTION OVER THIS OFFENSE

Finally, the defendant once again seeks to dismiss the indictment for lack of jurisdiction. The Court has already addressed this issue at least three times—first in the defendant's January 2020 Motion to Dismiss prior to her extradition here (Dkt. 343), then again in her May 2022 Motion after her arrival (Dkt. 431), and for a third time during her oral Rule 29 motion at the close of the government's case in chief at trial. The Court denied each of those motions. The evidence in the government's case came in at trial precisely as proffered in the government's pre-trial motions: there is no distinction or difference between the pre-trial proffers and the trial evidence that might impact the Court's prior rulings on this issue. There were and are two theories of extraterritorial jurisdiction under 18 U.S.C. § 2339B(d)(1): first that the defendant was "first brought" to the Eastern District of Virginia pursuant to 18 U.S.C. § 2339B(d)(1)(C), but also that she conspired with nationals of the United States[2] to commit the offense, pursuant to 18 U.S.C. § 2339B(d)(1)(F). The Court's original finding – that because "she has been accused of directly conspiring with persons, at least two of whom were located within the United States during the conspiracy, for the purpose of assisting the efforts of al-Shabaab, a foreign terrorist organization . . . designated as such by the United States Secretary of State [. . .] Hassan's conduct is sufficiently connected to the United States' interests to ensure that her prosecution is neither arbitrary nor unfair," Dkt. 360, p.1— remains correct and should not be disturbed.

In light of the above, the defendant cannot meet the legal standard to overcome the

---

[2] Those individuals include Muna Osman Jama, a U.S. citizen and a resident of the Eastern District of Virginia, Hinda Osman Dhirane, a U.S. citizen, and Amina Esse, a national of the United States under the statutory definition.

considered verdict of the jury. For the foregoing reasons, the United States respectfully asks that her motion be denied.

                                              Respectfully submitted,

                                              Jessica D. Aber
                                              United States Attorney

                 By:          /s/         .
                                              Danya E. Atiyeh
                                              Virginia Bar No. 81821
                                              Assistant United States Attorney
                                              United States Attorney's Office
                                              2100 Jamieson Avenue
                                              Alexandria, VA 22314
                                              Phone: (703) 299-3700
                                              Email: danya.atiyeh@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on May 24, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

                                                   /s/           .
Danya E. Atiyeh
Virginia Bar No. 81821
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: (703) 299-3700
Email: danya.atiyeh@usdoj.gov