UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>FARHIA HASSAN,<br><br>Defendant. | Case No. 1:14-cr-230<br><br>Hon. Anthony J. Trenga<br><br>Sentencing Hearing: August 1, 2022 |

**POSITION OF THE UNITED STATES
WITH RESPECT TO SENTENCING**

The United States of America, through undersigned counsel, in accordance with 18 U.S.C. § 3553(a), hereby files this Position with Respect to Sentencing in the instant case. The defendant was convicted on May 3, 2022, after a five-day jury trial, of Count One of the charged Second Superseding Indictment, conspiracy to provide material support to al-Shabaab, a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B. The government submits this memorandum in advance of the defendant's sentencing hearing, currently scheduled for August 1, 2022. For the reasons explained below, the government respectfully requests that the Court sentence the defendant to a term of imprisonment of 96 months, representing a serious term of imprisonment that varies downward slightly from the applicable Sentencing Guidelines range, as well as a term of ten years of supervised release to commence following the defendant's release from incarceration.

  **I. FACTS**

The defendant was an active member of an al-Shabaab fundraising conspiracy that operated beginning in or around April 2011 until the arrests of several of the members, including the

defendant, in July 2014. The conspiracy was described by cooperating witness Amina Esse as "the Group of Fifteen." According to the trial evidence, the Group of Fifteen consisted of roughly fifteen women who were members of the Somali diaspora residing across the world who met in a private PalTalk chatroom to discuss raising money to support al-Shabaab, and to plan and direct their individual financial contributions. The leaders of the group were Muna Osman Jama and Hinda Osman Dhirane, each of whom had a direct connection to a conduit to whom the group funneled the funds they raised. Jama was the conduit to the "Nairobi side," managed by Fardowsa Jama Mohamud, who operated two al-Shabaab safehouses in Nairobi, Kenya. Dhirane was the conduit to the "Hargeisa side," managed by Barira Hassan Abdullahi and several of her deputies, including Hodan Ismail Hassan. Abdullahi was the leader of the al-Shabaab women's movement in northern Somalia, operating primarily out of the Somaliland capital, Hargeisa. The money sent to the Hargeisa side was used to finance various al-Shabaab military operations in the Golis Mountain region of northern Somalia.

    The evidence at trial established that the defendant was an active member of the conspiracy. She was not a leader or manager—those roles fell to Jama and Dhirane—but she was one of the longest-serving members of the group, and one of the more reliable donors. Amina Esse testified that the defendant "welcomed" her into the group in April 2011 (*i.e.*, she was already a member of the group at that time), and she remained active in the group until the time of the arrests in July 2014. In one recorded conversation, she discusses the possibility of obtaining funding for the conspiracy from Somali women in her local community under false pretenses, but the group's leaders eventually rejected the notion as too risky.

    On June 26, 2014, a federal grand jury convening in the United States District Court for the Eastern District of Virginia returned a 21-count Superseding Indictment charging Muna Osman

Jama, Hinda Osman Dhirane, Fardowsa Jama Mohamed, the defendant, and Barira Hassan Abdullahi with one count of conspiracy to provide material support to a designated foreign terrorist organization, in violation of 18 U.S.C. §2339B; and twenty substantive counts of providing material support to a designated foreign terrorist organization, in violation of 18 U.S.C. §2339B. In July 2014, Farhia Hassan was arrested in the Netherlands and was released on bond pending extradition to the United States.

Extradition proceedings continued over the next seven years. During that time, Jama and Dhirane went to trial and were convicted, and co-conspirator Amina Esse pled guilty to a separate Criminal Information in Minneapolis, Minnesota. Because of various difficulties with the extradition process, on February 28, 2019, the government sought a one-count Second Superseding Indictment charging Farhia Hassan, Fardowsa Jama Mohamed, and Barira Hassan Abdullahi (a.k.a. "Barida") with a single count of Conspiracy to Provide Material Support to a Foreign Terrorist Organization, in violation of 18 U.S.C. §2339B. Upon the filing of the Second Superseding Indictment, the original Superseding Indictment was dismissed as to Hassan, Mohamed, and Abdullahi. On October 28, 2021, the defendant was arrested by United States authorities and has been held in federal custody since that time. The defendant exercised her right to a trial by jury, and on May 3, 2022, was convicted of the sole charge in the Second Superseding Indictment. She is now before the Court for sentencing.

## II. SENTENCING ANALYSIS

### A. Sentencing Guidelines

Although the Sentencing Guidelines are now advisory, sentencing courts nevertheless "must consult those Guidelines and take them into account when sentencing." *United States v.*

*Booker*, 543 U.S. 220, 264 (2005); *United States v. Clark*, 434 F.3d 684, 685 (4th Cir. 2006) (quoting *Booker*, 543 U.S. at 264). Thus, at sentencing a court "must first calculate the Guidelines range." *Nelson v. United States*, 555 U.S. 350, 351 (2009); *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Then, relying on that Guidelines range as "the starting point and the initial benchmark," the sentencing court must then "consider all of the [18 U.S.C.] § 3553(a) factors" in fashioning and imposing an appropriate sentence. *Gall v. United States*, 552 U.S. 38, 49–50 (2007); *United States v. Blue*, 877 F.3d 513, 517 (4th Cir. 2017).

Here, the Presentence Investigation Report (PSR) prepared by the United States Probation Office has correctly calculated the applicable final offense level as 40, and the defendant's Criminal History Category as VI (increased from a baseline Criminal History Category I by the application of the U.S.S.G. § 3A1.4 terrorism enhancement). The combination of the defendant's offense level and Criminal History Category yields a Sentencing Guidelines imprisonment range of the statutory maximum 180 months. PSR ¶ 81. The government has no objection to the Sentencing Guidelines calculation contained in the PSR. The defendant has three substantive objections to the Guidelines calculations, discussed individually below. The government respectfully submits, however, that the PSR has correctly calculated the Guidelines range, and that range should be applied by the Court at sentencing.

1. U.S.S.G. § 2M5.3(b)(1)(E)

The defendant first objects to the application of the two-level enhancement in U.S.S.G. § 2M5.3(b)(1)(E), which provides that the base offense level should be increased by two levels "[i]f the offense involved the provision of [ . . . ] funds or other material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act." This enhancement was also applied to Jama and Dhirane's Guidelines range at

4

their sentencings.  Here, the defendant argues that *conspiring* to provide funds does not "involve" the provision of funds as provided by the text of the enhancement.  But by a plain reading of the text, that is not the case.  Of course conspiracy to provide finds is a crime that "involves" the provision of funds.  And here, where the government adduced substantial evidence that the defendant did in fact provide funds, it is a distinction without a difference.

The defendant next objects to the application of the enhancement on the grounds that there was insufficient evidence to show the defendant's knowledge that the funds were intended to be used in a violent act.  Here, though, there was ample evidence of just such knowledge.  As a preliminary matter, Amina Esse testified about the lectures being delivered in the larger ISDAC chatroom, and testified that the defendant attended those lectures on an almost "daily" basis.  Esse testified about the calls to action that she frequently heard in the ISDAC chatroom: "that people should be killed . . . the unbelievers, Christians and the Jews."  According to Esse, the listeners in ISDAC were instructed that "if you have a gun, use it, use a car to overrun them . . . use a bottle to throw at them . . . any way you can participate in the jihad, even pour gas on them and light them on fire."  These calls to action were specifically for "jihad" in the Western world—listeners were instructed that if they could not participate in their home countries, they should "come to Somalia and join [al-Shabaab] there."  Esse also noted that the listeners were instructed that if they could not conduct an attack or travel, they should donate, because the jihad could not take place without financial contributions.  It was against this violent backdrop that the defendant and the Group of Fifteen sent money to the Nairobi side and the Hargeisa side.

  2. *U.S.S.G. § 3A1.4(a)*

Next the defendant objects to the application of the § 3A1.4 terrorism enhancement.  This subsection provides for a 12-level enhancement to the base offense level (or an increase to level

5

32, whichever is greater). Application Note 1 provides that a "federal crime of terrorism" for purposes of this guideline is defined in 18 U.S.C. § 2332b(g)(5), which states, in relevant part:

> (5) the term "Federal crime of terrorism" means an offense that –
>
> (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and
>
> (B) is a violation of –
>
> (i) . . . 2339B (relating to providing material support ot terrorist organizations).

The trial record was replete with evidence that the defendant and the rest of the Group of Fifteen intended to influence the conduct of the Transitional Federal Government in Somalia and to retaliate against that government's actions. Further, the offense was plainly one that involved the provision of material support to a designated foreign terrorist organization.

### 3. U.S.S.G. § 3B1.2

Finally, the defendant argues that she should receive a "minor role" adjustment under U.S.S.G. § 3B1.2. The defendant's argument for this adjustment seems to be based primarily on the fact that the defendant appeared substantially less frequently in the government's recorded communications than Jama and Dhirane, and that she did not exercise any decision-making authority in the conspiracy. As a preliminary matter, while it is true that the defendant did not have a leadership role in the conspiracy, the lack of a leadership role does not render one's participation in a conspiracy "minor." Here, the defendant was one of the longer-serving members of the conspiracy, and one of its more reliable donors. She routinely pledged money, and in several calls and chats various members of the conspiracy state that her contributions were "received." She appears frequently in Jama's ledgers. She was what the Guidelines describe as an "average participant." The facts simply do not support any sort of mitigating role adjustment here.

The argument that the defendant "was barely present on calls or chats" also does not bear on whether she served only a minor role in the conspiracy. It is indeed true that the defendant was captured on far fewer calls or chats than Jama or Dhirane. This is, however, perhaps less a function of the defendant's role in the conspiracy, and more an artifact of the manner in which the investigation was conducted—that is to say, with electronic surveillance, searches of residences and vehicles, reviews of hawala records, and so forth that were contained *in the United States*. The surveillance captured so many of Jama and Dhirane's calls because it targeted Jama and Dhirane's calls, not because Jama and Dhirane were the only people in the conspiracy to communicate with one another. The fact that a defendant appears less frequently on surveillance than the people who were the primary targets of the surveillance does not prove that the defendant was any less of an active participant in the conspiracy. It proves only that her communications were captured less frequently.

### B. 18 U.S.C. § 3353(a) Factors

After calculating the Guidelines range, a sentencing court must consider that range and the sentencing factors set forth in § 3553(a) to determine an appropriate sentence. *Nelson*, 555 U.S. at 351. These factors include the nature and circumstances of the offenses; the history and characteristics of the defendant; and the need for the sentence imposed to reflect the seriousness of the offenses and afford adequate deterrence. 18 U.S.C. § 3553(a). Based upon consideration of these factors and for the reasons that follow, the United States respectfully recommends that the Court impose a term of imprisonment of 96 months, representing a sentence that varies downward slightly from the imprisonment range suggested by the Sentencing Guidelines.

1. *Nature and Circumstances of the Offenses*

The defendant's offenses are extraordinarily serious. The Group of Fifteen did not wear suicide vests, shoot AK-47s, or carry out attacks. But they financed the suicide vests and the machine guns, they fed and sheltered the al-Shabaab fighters, they provided the vehicles and machinery that kept the terrorists' violent operation in motion. The charge at issue is a significant terrorism offense, and even the relatively small amounts of money at issue provided each month by the defendant readily add up, at Matthew Bryden testified, to the price of an al-Shabaab fighter's monthly wages, the rent on a Nairobi safehouse, the cost of an AK-47 or a camel or a truck— especially when those contributions are pooled with the other members of the conspiracy. Amina Esse provided perhaps the most evocative testimony as to the significance of these contributions to al-Shabaab when she relayed the rhetoric being shared in the ISDAC chatroom: she testified that the lecturers encouraged homeland attacks, and they encouraged travel to Somalia to fight— but for those who could not travel, they should donate money, because the jihad could not continue without those donations. The work of the Group of Fifteen was meaningful and impactful toward al-Shabaab's violent terrorist ends, and a serious term of incarceration is necessary to reflect the seriousness of that offense.

2. *The History and Characteristics of the Defendant*

The defendant is 38-year-old citizen of the Netherlands. She has provided very limited information about her past, and most of the information her counsel has provided to the Court has come via her husband, with the defendant herself unwilling to confirm many of the demographic facts provided. In short, however, the defendant was born in Mogadishu, Somalia, and fled as a young teenager during the civil war, eventually settling in the Netherlands as a refugee in roughly

1999. She has lived there since, with her husband of 20 years and six children. She has never worked outside the home.

The defendant was an active participant in the Group of Fifteen, described by various members of the group as a reliable donor, someone who could be counted on to make her monthly payments on time. She was willing to engage in deception to further the conspiracy's goals, as evidence by the conversation where she relays to Dhirane that she has received pledges of ten dollars from women in her local community who have been told that the money will be used to provide for orphans, when it was really intended for Barira Hassan Abdullahi's al-Shabaab fundraising network. She was clearly devoted to making her payments regularly, as evidenced by her call to Jama upon returning from an overseas trip—apparently immediately after her return, she reached out to make sure she could continue sending money to the same recipients.

The information adduced at trial and the information provided by the defense in their objections and argument are in many respects aligned—there is no real disagreement that the defendant was a housewife who became radicalized by internet propaganda, and as a result, came to support a violent and twisted view of Islam that advocated for terrorist attacks, assassinations, and warfare. The defendant has sought to portray herself as a victim of that propaganda. Perhaps, as the defendant contends, her susceptibility to radicalization was a result of the trauma she suffered during her flight from Somalia as a child. Perhaps it was a result of her untreated, or insufficiently treated, post-partum depression. But the underlying causes of her radicalization are largely insignificant for sentencing purposes when set against the fact that *she has never deradicalized*. She has never foresworn al-Shabaab's violent ideology. She has been unwilling to provide information to the Probation Office. She has refused to accept responsibility for her crimes. Every indication before the Court is that she believes just as firmly in al-Shabaab's

mission as she did in 2011 when the conspiracy began. For all of those reasons, a lengthy sentence is appropriate here.

       3.      *Need for Sentence to Promote Respect for the Law*

The seriousness of the offense and the need to provide just punishment is obvious from a mere recitation of the facts of these crimes. Because the Court is thoroughly familiar with them, they will not be belabored again here. The need to promote respect for the law and need to deter similar criminal conduct do merit particular attention, however.

The members of the Group of Fifteen were intimately familiar with the prosecutions of the nearly identical crimes that were happening even as the defendants plotted to continue to support al Shabaab and its indiscriminate violence. They were aware of law enforcement efforts in other countries to disrupt the support of terrorism – including the actions of members of the Group of Fifteen. The defendant actively sought to enlist others who could replace donors within the group who had come under scrutiny by the authorities in Somalia, the United Kingdom, Sweden, and elsewhere. The defendant sent money under false names, suggesting her understanding that her contributions violated the law. Yet, in spite of all, the defendant steadfastly pursued the group's goal of providing shelter and materiel to al-Shabaab so that it could continue the violence against soldiers and civilians alike that she and her co-conspirators so supported.

Obviously, the defendant has very little respect for the laws of the United States, and no sentence will ever persuade her otherwise. But there are others who may be dissuaded from supporting al-Shabaab and other terrorist organizations. There may be others for whom the specter of a substantial period of incarceration would cause them to stop if they already were providing material support. This was the case with Amina Esse who, both before and for some

time after she was a part of the conspiracy, was an ideological supporter of al-Shabaab. Nonetheless, she had no interest in financially supporting al-Shabaab because of the possibility of being caught and imprisoned. Accordingly, shortly after she learned of the true purpose for the money she was sending, she abandoned the conspiracy. Also, as Jama and Dhirane discussed, others among their co-conspirators became "paranoid" and stopped sending payments when law enforcement officials in their respective countries came to scrutinize their activities.

A substantial period of incarceration for the defendant would of course appropriately reflect the seriousness of her offense and accord her the just punishment she deserves. Perhaps even more important, a substantial sentence would also promote a respect for our antiterrorism laws sufficient to cause others to reject the entreaties being made daily across worldwide social media outlets to support and engage in terrorism.

    4.    *Need for Sentence to Afford Adequate Deterrence*

As the Court knows, these crimes are extremely difficult to discover, investigate, and prosecute. The conspiratorial agreements, the recruitment of accomplices, the discussions of who has paid the "living expenses," to whom they should be sent, and whether they were received all take place in private chat rooms to which admission is by invitation only. Even when a material support cell is discovered, establishing the identities of the co-conspirators is a difficult task. The defendants here operated only from behind computer screens in their own homes. They were careful to keep their identities hidden behind usernames that they changed when they believed that they or their co-conspirators might have come under scrutiny. In many cases, the defendants and their co-conspirators kept their identities secret even from *each other*. Establishing the identities of co-conspirators in foreign countries who are identified only by their usernames sometimes requires herculean effort by the FBI and its foreign counterparts.

Proof of the actual payment of money to a foreign terrorist organization can only be seen as if through a glass, darkly. The payments by the U.S.-based co-defendants in this case, for example, were often made via the ZAAD system – the records of which are scarce and difficult to obtain from a country such as Somalia. Adding further to the difficulty of detecting and prosecuting cases of this kind is their far-flung international scope. Here, the co-conspirators were located in Kenya, Somalia, the Netherlands, the UK, Sweden, Egypt, Finland, Canada, the UAE, as well as in Virginia, Seattle, San Diego, and Minneapolis. Obtaining evidence from foreign countries requires the laborious and sometimes Byzantine process of mutual legal assistance treaties and the involvement of court proceedings in the foreign country. For example, although the defendant was arrested in the Netherlands on the same day as were Jama and Dhirane, and while her residence was searched there on the same day as were the Jama and Dhirane residences, it took over a year to obtain the evidence seized during the search, and nearly seven years to finally accomplish her extradition.   The U.S. government was never able to successfully obtain any of the defendant's money transfer records from the Netherlands, beyond what was seized from her residence.   In territories such as Somaliland, which the U.S. government does not recognize, there exist no such law enforcement mechanisms at all.

That all of the written and spoken communications take place in Somali is another complicating factor, requiring the translation and transcription of hundreds of conversations over multi-year periods. The entirety of the recordings of conversations must all be monitored by Somali-speaking linguists so that any relevant conversations, whether inculpatory or arguably exculpatory, can be identified. As the Court is aware, these recordings, text messages, and other intercepted information constituted terabytes of data. These must then be translated, at least in summary form, for review by the trial team. Any conversations that would be introduced at trial

or disclosed as potential *Brady* must then be translated and transcribed in full. All of these transcripts must then be quality controlled by a final Somali linguist who can testify to the accuracy at trial. As the Court itself witnessed, finding qualified Somali interpreters and translators is itself a difficult task. Adding to the difficulty is the co-conspirators use of code words and guarded speech, spoken in a language that does not always translate well into English. This process is another herculean task that serves as a barrier to prosecution in these cases. As the difficulty in detecting and prosecuting violations of our anti-terror laws increases, the risk of capture and conviction diminishes. As a result, respect for our anti-terror laws diminishes commensurately. Where the risk of detection is seen as relatively small and the punishment for violations is regarded as relatively slight, there can be no deterrence of these crimes. To promote respect for the law in such cases, when a perpetrator *is* captured and *is* convicted, the penalties for such crimes must be significant.

     5.     *Sentencing Guidelines Range and Unwarranted Sentence Disparities*

18 U.S.C. § 3553(a)(4) instructs a sentencing court to consider the Sentencing Guidelines range applicable to the defendant. For the reasons discussed above, the Government respectfully submits that the PSR properly calculates the Sentencing Guidelines range as 180 months. Here, however, the need to avoid unwanted sentencing disparities calls for a downward variance from the Guidelines range, to reach parity with the sentences of more culpable co-defendants.

Co-defendant Muna Osman Jama, the primary leader of the Group of Fifteen, was sentenced after to trial to 144 months (12 years) of incarceration. Co-defendant Hinda Osman Dhirane, the secondary leader of the Group, received a sentence of 132 months (11 years) of incarceration. Both co-defendants received leadership role enhancements in their Guidelines calculations.

As argued extensively above, the defendant's role in the conspiracy was serious and significant. It was not minimal or minor. But it would not be in the interest of justice to give the defendant a longer sentence than her more culpable co-conspirators. Jama and Dhirane were the leaders of the Group of Fifteen. The defendant was a devoted member and a loyal follower, but she cannot be said to be as culpable, or more culpable, than Jama and Dhirane. As a result, a downward variance from her Guidelines range is appropriate here. For these reasons, the government believes that a sentence of 96 months (8 years) of incarceration is an appropriate sentence to acknowledge the seriousness of the evidence while avoiding unwarranted disparities between the defendant's sentence and those of Jama and Dhirane.

### III.  CONCLUSION

For the foregoing reasons, the United States respectfully recommends the Court impose a sentence of 96 months' imprisonment, to be followed by a 10-year term of supervised release (commensurate with the term received by Jama and Dhirane) to satisfy the factors enumerated in 18 U.S.C. § 3553(a). Given the defendant's failure to accept responsibility, her lack of any claim to consideration for cooperation, and her conviction that came only after a full jury trial, the United States respectfully submits that the only just sentence in this case is a lengthy and serious one, with an appropriate downward variance to guard against disparate sentences among co-defendants.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By: _____/s/_____
Danya E. Atiyeh
Virginia Bar No. 81821
Assistant United States Attorney
United States Attorney's Office

2100 Jamieson Avenue<br>
Alexandria, VA 22314<br>
Phone: (703) 299-3700<br>
Email: danya.atiyeh@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2022, I caused a copy of the foregoing memorandum to be filed with the Clerk of Court using the CM/ECF system, which will automatically generate a Notice of Electronic Filing (NEF) to all counsel of record.

/s/
Danya E. Atiyeh
Assistant United States Attorney